**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JASON AUGUST BERNARD, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | No. 08-5918 |
| Commissioner of the | : | |
| Social Security Administration, | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

TIMOTHY R. RICE                                                    October 21, 2009
U.S. MAGISTRATE JUDGE

Resolution of this case depends on whether the Administrative Law Judge ("ALJ")

improperly rejected the medical opinions of plaintiff Jason August Bernard's treating physician

in determining his Residual Functional Capacity ("RFC")[1] and erred in failing to find Bernard's

impairments severe. Bernard seeks judicial review of the ALJ decision rejecting his application

for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").

Bernard alleges the ALJ's decision was not supported by substantial evidence because:

(1) the ALJ failed to find his diagnoses of C7 radiculopathy, chronic headaches, left ankle pain

and gastrointestinal problems "severe;" (2) the ALJ failed to rule Bernard's impairments meet or

---

[1] "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001) (quoting Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)).

1

medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1;[2] (3) the ALJ

did not give appropriate weight to Bernard's treating physician's opinion; (4) the ALJ failed to

include all of Bernard's limitations in the hypothetical question given to the vocational expert;

(5) the ALJ did not assess Bernard's residual functional capacity ("RFC") in accordance with the

SSI regulations and laws; and (6) the ALJ failed to find Bernard had limitations from severe

mental health disorders.  See Plaintiff's Brief and Statement of Issues in Support of Request for

Review at 3-27, Bernard v. Astrue, No. 08-5918 (E.D. Pa. June 22, 2009) [hereinafter Plaintiff's

Brief].[3]

     After careful review, I find the ALJ's decision was not supported by substantial evidence

because the ALJ did not give appropriate weight to Bernard's treating physician's opinion, see

Plummer v. Apfel, 186 F.3d 422, 429 (1999), see also 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2), and failed to find C7 radiculopathy, chronic headaches, left ankle pain, and

gastrointestinal problems were "severe" impairments, see Newell v. Comm'r of Soc. Sec., 347

F.3d 541, 546-47 (2003).  Accordingly, I respectfully recommend Bernard's request for review

be GRANTED and the matter be REMANDED for further proceedings consistent with this

---

[2] The Listing of Impairments is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background.  Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The Listing defines impairments that would prevent an adult, regardless of age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity.  See 20 C.F.R. § 416.925(a) (purpose of the listings is to describe impairments "severe enough to prevent a person from doing any gainful activity").  The Listing was designed to operate as a presumption of disability making further inquiry unnecessary.  Sullivan v. Zebley, 493 U.S. at 532.

[3] Although the Plaintiff's Brief states the plaintiff appeals four of the ALJ's findings, see Plaintiff's Brief at 3, the brief's argument section asserts six grounds of appeal, see Plaintiff's Brief at 7-25.

Report and Recommendation.

BACKGROUND

Bernard applied for SSI and DIB on April 15, 2005, alleging disability since December 1, 2004. R. at 52-96, 383-386. His application was initially denied on August 3, 2005. R. at. 388. The ALJ heard testimony from Bernard and vocational expert Dr. Richard J. Baine on February 22, 2007, R. at 398, and denied Bernard's claims March 2, 2007, R. at 17-25.

The ALJ found Bernard met the insured requirements of the Social Security Act through June 30, 2010. R. at 17. The ALJ applied the five-step sequential analysis[4] to determine Bernard's disability claim. R. at 18-25. At step one, the ALJ found Bernard had not engaged in

---

[4] The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims, which is codified 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920. These steps are summarized as follows:

Step One:  If the claimant is working and the work is substantial gainful activity, a finding of not disabled is directed. If not, proceed to Step Two. 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).

Step Two:  If the claimant is found not to have a severe impairment, or severe combination of impairments, which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed. If there is a severe impairment, proceed to Step Three.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

Step Three:  If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 to Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed. If not, proceed to Step Four.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Step Four:  If the claimant retains the RFC to perform past relevant work, a finding of not disabled is directed. If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step Five.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Step Five: The Commissioner will then consider the claimant's RFC, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant can adjust to other work or is disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920 (a)(4)(v).

substantial gainful activity since December 1, 2004, the alleged onset date.  R. at 9.  At step two,

the ALJ found Bernard suffered from the following severe impairments: disc disease of the

cervical and lumbar spine, spondylolisthesis,[5] depression, and anxiety.  R. at 20.  The ALJ found

the record did not support Bernard's lack of attention and concentration claims.  R. at 20.  The

ALJ failed to address Bernard's C7 radiculopathy, chronic headaches, ankle pain, and

gastrointestinal problems, which were detailed in the record.[6]  See R. at 20; see also R. at 353.

At step three, the ALJ held Bernard does not have an impairment or combination of impairments

that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1.  R. at 20.  After reviewing various medical reports, the ALJ concluded Bernard's

condition improved and he was no longer in disabling pain.  R. at 22.   The ALJ noted Dr.

Mortazavi, Bernard's pain specialist, stated Bernard was unable to maintain gainful employment,

R. at 22; see also R. at 353, but that Dr. Mortazavi did not mention specific extertional work

limitations,  R. at 22.  The ALJ concluded Bernard had the RFC to perform sedentary work if he

can sit or stand at will and is not required to do more than routine one- or two-step tasks.  R. at

20-21.  The ALJ found Bernard could not perform his past relevant work at step four because his

past work was not sedentary work.   R. at 23.  At step five, after considering Bernard's age,

education, work experience, and RFC, the ALJ identified potential jobs for Bernard existing in

---

[5] Spondylolisthesis is a condition where a bone (vertebrae) in the lower part of the spine slips forward and onto the bone below it causing lower back pain, pain in the thigh and buttocks, stiffness, and tenderness in the area of the slipped disc.  Medline Plus, http://www.nlm.nih.gov/ medlineplus/encyclopedia (search "spondylolisthesis;" then follow "spondylolisthesis" hyperlink) (last visited Oct. 1, 2009).

[6] Dr. Steven Mortazavi, Bernard's treating physician, discussed these impairments in his February 2, 2007 letter.  R. at 353.  The Commissioner does not contend that these impairments were not properly presented to the ALJ.

significant numbers in the national economy.  R. at 24.  These jobs included unskilled packer, assembler, and sorter.  Id.

FACTUAL  HISTORY

Bernard, 31 at the time of the ALJ's decision,[7] received his GED in 1993, R. at 85, and previously worked as a security guard, salesperson, retail assistant manager, and a customer service representative, R. at 90.  He lives in an apartment above a family friend's garage with his wife and his infant daughter.  R. at 405.

Bernard claimed disability due to back disorders, which developed in 2001, R. at 377. He was diagnosed with spondylolisthesis, lumbar spinal stenosis,[8]  and degenerative disc

---

[7] Bernard is considered a "younger person" under the Commissioner's regulations, which define a younger individual as a person under age 50.  See 20 C.F.R. §§ 404.1563(c); 416.963(c). Age is considered one of the relevant factors in determining whether a claimant can adjust to other work in the national economy.  Advancing age is "an increasingly limiting factor in a [claimant's] ability to make such an adjustment," 20 C.F.R. §§ 404.1563(a); 416.963(a); however, a younger person's age is generally not considered to seriously impact the ability to adjust to other work, 20 C.F.R. §§ 404.1563(c); 416.963(c).

[8] Lumbar spinal stenosis is characterized by the narrowing of the vertebral canal, nerve root canals or intervertebral foramina of the lumbar spine caused by encroachment of bone upon space.  Symptoms include pain in the buttocks, thighs, or calves, paresthesias, and weakness. The condition may be either congenital or due to spinal degeneration.  Dorland's Illustrated Medical Dictionary 1795 (31st ed. 2007) [hereinafter Dorland's].

disease.[9]  R. at 150.  Bernard had his first spinal fusion[10] on or before January 2003[11] but

continued to complain of neck pain, numbness in the arms, and leg and arm weakness.  See R. at

150.  Bernard's physician, Dr. Christopher Pogodozinski, referred Bernard to orthopedic surgeon,

Dr. Stephen Falaytan,  R. at 84.  On March 7, 2005, Dr. Falaytan diagnosed Bernard with a

nonunion[12] at L5/S1,[13] right arm radicular pain, weakness in the C7 distribution, and cervical

spinal stenosis at C6/7,[14] which the doctor believed caused Bernard's left side neck pain.  R. at

151.  On May 10, 2005, Dr. Falaytan operated on Bernard and confirmed he had lumbar spinal

stenosis, and pseudoarthrosis.[15]  R. at 154.  Dr. Falaytan also confirmed Bernard's previous

---

[9] Degenerative disc disease is the gradual deterioration of the discs between the vertebrae.
American Spinal Decompression Therapy Association, http://www.american
spinal.com/degenerative-disc-disease.html (last visited Sept. 24, 2009).

[10] A spinal fusion is a surgery to permanently fuse vertebrae.  Medline Plus,
http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "spinal fusion") (last visited
Sept. 28, 2009).

[11] It is unclear the exact year of Bernard's first spinal fusion.  Dr. Christopher
Pogodozinski and the St. Luke's Hospital's History and Physical Inpatient report list January
2003.  R. at 150, 164.  Dr. Mortazavi first asserted the surgery was in January 2002, R. at 253,
and then asserted it was in January 2001, R. at 353.

[12] A nonunion is a failure of the fragments of a broken bone to knit together.  Medline
Plus, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "nonunion") (last
visited Oct. 8, 2009).

[13] L5/S1 are lumbosacral nerve roots.  Harrison's Principles of Internal Medicine 109
(17th ed. 2008) [hereinafter Harrison's].

[14] C6 and C7 are cervical nerve roots.  Harrison's at 115.  C6 is associated with the
biceps, thumb, index fingers, radial hand, and lateral forearm.  Id.  C7 is associated with the
triceps, middle fingers, posterior arm, dorsal forearm, and lateral hand.  Id.

[15] Pseudeoarthrosis, also known as pseudarthosis, is an abnormal union formed by fibrous
tissue between parts of a bone that has fractured due to congenial weakness.  Medline Plus,
http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "pseudeoarthrosis") (last
visited Oct. 1, 2009).

spinal fusion had failed.  Id.

Despite his May 2005 spinal fusion, Bernard's back and leg pain persisted.  R. at 143.  On June 15, 2005, Dr. Falaytan reported Bernard had nonunions at two levels and recommended Bernard undergo another spinal fusion.  Id.  On August 16, 2005, Bernard had a third spinal fusion.  R. at 234.  His postoperative diagnoses included lower back pain, lumbar spinal stenosis, and lumbar fusion nonunions.  Bernard's pain persisted.  R. at 258.

On November 29, 2005, Dr. Mortazavi, a pain specialist, conducted an initial evaluation of Bernard's low back pain, cervical radiculopathy,[16] and cervicalgia.[17]  Id.  During the examination, Bernard said he suffered severe pain, numbness, and extremity tingling.  Id.  Dr. Mortazavi confirmed Bernard had degenerative disc disease of the lumbar, cervical radiculopathy, and cervicalgia, id., and diagnosed Bernard with osteoarthritis,[18] R. at 253, 260.

Bernard was treated by Dr. Mortazavi from 2005 to 2007.  R. at 238-60.  From November 2005 until March 2006, Dr. Mortazavi reported Bernard was in "acute distress,"  R. at 252, 255,

---

[16] Cervical radiculopathy is disease of the nerve root.  Dorland's at 1595.  It is also called C6 or C7 radiculopathy.  See Harrison's at 115-116.  The condition occurs when cervical spondylosis compresses one or more of the spinal nerves branching out of the cervical vertebrae. It can lead to permanent disability.  MayoClinic.com, http://mayoclinic.com/health/ cervical-spondylosis/DS00697 (last visited Sept. 23, 2009).  Cervical radiculopathy can result in pain, numbness, or weakness in the shoulder, arm, wrist or hand.  American Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (last visited Oct. 6, 2009).

[17] Cervicalgia is a cervical sprain or strain, typically referring to acute pain arising from injured soft tissues of the neck.  Walter R. Frontera, Julie K. Silver, Thomas D. Rizzo, Jr., Essentials of Physical Medication and Rehabilitation 23 (2008).

[18] "Oseoarthritis is a chronic disorder associated with damage to the cartilage and surrounding tissues and characterized by pain, stiffness, and loss of function."  Merck Manuals Online Medical Library, http://www.merck.com/mmhe/sec05/ch066/ch066a.html?qt= Osteoarthritis%20(OA)&alt=sh (last visited Sept. 18, 2009).

258, and suffered from bilateral ankle pain, R. at 241, 243, 258, and cervicogenic headaches, R. at

243-53.  Dr. Mortazavi also cited Bernard's myriad gastrointestinal problems[19] in his November

29, 2005, February 1, 2006, March 28, 2006, May 31, 2006, and November 27, 2006 reports.  R. at

240, 248, 252, 255, 258.

On February 1, 2006, Dr. Mortazavi conducted a follow-up evaluation and concluded four

of Bernard's pain medications were ineffective.  R. at 255.  The pain medications, however,

Roxicodone and OxyContin[20] were helping Bernard manage the pain by "taking the edge off."  Id.

Dr. Mortazavi noted Bernard's symptoms were exacerbated by cold and damp weather, and

Bernard still rated his pain as a six out of ten despite the pain medication.  Id.  Dr. Mortazavi

diagnosed Bernard with degenerative disc disease of the lumbar spine, low back pain,

radiculopathy, osteoarthritis, and cervicalgia.  Id.  Dr. Mortazavi's February 14, 2006 radiology

report also documented Bernard's cervicalgia and radiculitis.  R. at 261.

On March 15, 2006, Dr. Falatyn reported Bernard was experiencing thigh pain, which

started several months after his August 2005 spinal fusion.  R. at 291.  Dr. Falatyn noted Bernard's

back pain "seem[ed] to be diminishing," but Bernard had meralgia parethesia.[21]  See id.  Dr.

---

[19] Bernard's gastrointestinal problems include nausea, vomiting, increased constipation, urinary retention, bowel incontinence, diarrhea, and irritable bowel syndrome.  R. at 240-58.

[20] Roxicodone and OxyContin are brand names for oxycodone, a narcotic used to relieve severe pain.  See Medline Plus, http://www.nlm.nih.gov/medlineplus/encyclopedia.html (search "OxyCotin;" then follow "Oxycodone" hyperlink) (last visited Oct. 13, 2009).

[21] Meralgia paresthesia is a condition where a patient has pain and paresthesia in the outer surface of the thigh.  See Dorland's at 1153.  Paresthesia a sensation of prickling, tingling or creeping on the skin usually associated with injury of a nerve or a nerve root.  Medline Plus, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "parethesia") (last visited Oct. 1, 2009).

Falatyn stated Bernard was experiencing thigh pain, burning sensation in the skin on his upper

thigh, left arm pain, neck pain, and numbness and paresthesias in both his arms and fingers.   Id.

Despite using a Fentanyl patch[22] and taking six Percocet[23] each day, Bernard rated his pain a six to

eight out of ten.   Id.

On October 25, 2006, Dr. Falatyn reported Bernard's back and leg pain improved after

Bernard's spinal fusion in August 2005, R. at 287, but Bernard was still suffering from

paresthesias on his left thigh.   Id.   He noted Bernard's neck pain had worsened and he was

suffering from numbness and paresthesias in both arms and in his fingers.   Id.   A left arm

electromyography[24] ("EMG") showed Bernard had C7 chronic radiculopathy.[25]   Id.   Dr. Falatyn

stated Bernard was taking several narcotics including Fentanyl and Oxycodone for his neck pain as

well as bilateral arm numbness.   Id.

On January 15, 2007, Dr. Mortazavi stated Bernard was not in "acute distress" and had

normal gait and station.   R. at 238.   However, Dr. Mortazavi also stated Bernard reported his

---

[22] Fentanyl patch is a patch containing fentanyl, a very strong narcotic pain medication. See U.S. Food and Drug Admin., Fentanyl Transdermal Patch, http://www.fda.gov/Drugs/Drug Safety/PublicHealthAdvisories/ucm048721.htm (last visited Oct. 13, 2009).

[23] Percocet is a pain medication.  See Medline Plus, http://www.nlm.nih.gov/medlineplus /encyclopedia.html (search "percocet;" then follow "Hydrocodone/oxycodone overdose" hyperlink) (last visited Oct. 13, 2009).

[24] An electromyography is a test which checks the health of the muscle and its nerves. Medline Plus, http://www.nlm.nih.gov/medlineplus/encyclopedia.html (search "electromyography;" then follow "EMG (Electromyography)" hyperlink) (last visited Oct. 2, 2009).

[25] C7 radiculopathy is radiculopathy which stems from the C7 cervical nerve root. Harrison's at 115.  Consequentially, patients with this type of radiculopathy will experience pain in their posterior arm, dorsal forearm, and lateral hand.  Id.  This form of radiculopathy affects patient's triceps, wrists, and fingers.  Id.

symptoms had worsened, id., and noted Bernard was still suffering from cervicalgia, cervical

radiculopathy, cervical spinal stenosis, and low back pain.  Id.

On February 2, 2007, Dr. Mortazavi wrote a letter asserting that "due to Bernard's chronic

pain condition," Bernard was not able to "continue with gainful employment," R. at 353, listing

numerous diagnoses of "overall poor health," including low back pain, cervicalgia, cervical spinal

stenosis, cervical degenerative disc disease, C7 radiculopathy, left ankle pain, headaches and

gastrointestinal problems.  Id.   Dr. Mortazavi also noted Bernard is on a "medication regimen that

keeps his pain to a somewhat tolerable level where he is able to go throughout his day."  Id.

Nevertheless, Dr. Mortazavi concluded Bernard is not able to work because of his pain condition.

Id.

On February 22, 2007, Bernard testified at a hearing before the ALJ.  He said he cares for

his daughter when his wife is at work with the aid of his wife's grandparents who live

approximately one hundred feet away from his home.  See R. at 405, 407.  Bernard stated he can

usually only take care of his daughter for a maximum of two to three hours, in the morning, R. at

407, and then his wife's grandparents pick her up and take care of her until his wife returns home

from work.  See R. at 408.

Bernard also testified about his activity level.  Bernard said he cannot lift his infant

daughter, does not do laundry, and cannot pick up his daughter's toys from the floor.  R. at 410.  He

occasionally vacuums, but can only vacuum half a room.  Id.   Bernard does not drive and stated,

even as a passenger, trips exceeding twenty minutes are painful.  R. at 406.  Bernard testified he

cannot stand for more than fifteen minutes and when he sits he wants to get right back up and walk

around.  R. at 413.  Bernard stated it was difficult for him to stay seated during his testimony

because of his conditions.  See R. at 413.  He stated he has to "contort [] in awkward positions" for

his neck and back to feel better.  Id.  Bernard maintained he experiences neck pain, thigh pain,

numbness in his arm, and gastrointestinal problems.  See R. at 415.

DISCUSSION

I.      Legal Standard

I must determine whether substantial evidence supports the Commissioner's final decision.

42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).  The factual findings

of the Commissioner must be accepted as conclusive if they are supported by substantial evidence.

Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); Diaz v. Comm'r of

Soc. Sec., 577 F.3d 500, 503 (3d Cir. 2009); Rutherford, 399 F.3d at 552.  "Substantial evidence is

'more than a mere scintilla.'"  Diaz, 577 F.3d at 503 (quoting Plummer v. Apfel, 186 F.3d 422, 427

(3d Cir. 1999)).  It is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)); Diaz, 577 F.3d at 503.  I may not weigh the evidence or substitute my own

conclusions for that of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  I must defer

to the ALJ's evaluation of evidence, assessment of the credibility of witnesses, and reconciliation of

conflicting expert opinions.  Diaz,  577 F.3d at 506.  If the ALJ's findings of fact are supported by

substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry

differently.  Fargnoli, 247 F.3d at 38.  At the same time, however, I must remain mindful that

"leniency [should] be shown in establishing claimant's disability."  Reefer, 326 F.3d at 379 (quoting

Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979)).

In addition, I retain "plenary review over the ALJ's applications of legal principles."  Payton

v. Barnhart, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006) (Katz, S.J.) (citing Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995)).  Thus, I can overturn an ALJ's decision based on an incorrect legal standard even if I find it supported by substantial evidence.  Id. (citing Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983)).

A claimant is disabled if he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1520, 416.905; Diaz, 577 F.3d at 503 (citing Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000)).  The claimant satisfies his burden by showing an inability to return to his past relevant work.  Rutherford, 399 F.3d at 551.  Once this showing is made, the burden shifts to the Commissioner to show the claimant, given his age, education, and work experience, has the ability to perform specific jobs existing in the economy.  20 C.F.R. §§ 404.1520, 416.920; see Rutherford, 399 F.3d at 551.

The ALJ may not make speculative inferences from medical evidence, see e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence, see Diaz,  577 F.3d at 505 (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).  "[W]hen a conflict in the evidence exists, the ALJ may choose whom to credit, but cannot reject evidence for no reason or for the wrong reason.  The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."  Diaz, 577 F.3d at 505-06 (quoting Plummer, 186 F.3d at 429).

II.     Bernard's Claims

    A.     The ALJ Improperly Rejected Bernard's Treating Physician's Opinion.

The ALJ's RFC finding is not supported by substantial evidence because the ALJ improperly rejected Dr. Mortazavi's opinion despite supporting medical evidence.  In determining what weight medical evidence deserves, the ALJ must first assess whether it is from a treating, non-treating, or non-examining source.  A treating source is a physician, psychologist, or other acceptable medical source who provides a patient with "medical treatment or evaluation," and has an "ongoing treatment relationship with the patient."  20 C.F.R.§ § 404.1502, 416.902.  A medical source may be considered a treating source where the claimant sees the source "with a frequency consistent with accepted medical practice for the type of treatment . . . required for [the claimant's] condition (s)."  Id.  A medical source is not a treating source if the treatment is based "solely on [the claimant's] need to obtain a report in support of [claimant's] claim for disability," and not based on medical need for treatment.  Id.

A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-2p, 1996 WL 374188.  A treating physician's opinion may be rejected "on the basis of contradictory medical evidence," Plummer, 186 F.3d at 429, or if unsupported by sufficient clinical data, Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).  The opinion may be accorded "more or less weight depending upon the extent to which supporting explanations are provided."  Plummer, 186 F.3d at 429 (citing Newhouse, 753 F.2d at 286).  Where a treating source's opinion is not given controlling weight, the ALJ must determine what weight to give the treating, non-treating, and non-

13

examining sources by considering factors such as the length of the treatment relationship and frequency of visits, nature and extent of the treatment relationship, whether the medical source supports the opinion with medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization.  20 C.F.R. §§ 404.1527(d), 416.927(d).   In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports," and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion."  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

As a treating physician,[26] Dr. Mortazavi's opinion merits deference.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  In his February 2, 2007 letter to the ALJ, Dr. Mortazavi opined Bernard could not work due to Bernard's chronic pain condition.  R. at 353.  The letter detailed Bernard's medical impairments affecting his daily activities, highlighted by three spinal fusion surgeries, cervical discomfort, low-back pain, and ankle discomfort.  Id.  Dr. Mortazavi also listed Bernard's other medical conditions, such as chronic headaches, gastrointestinal problems, low back pain, cervicalgia, left C4-5, C5-6, and C6-7 disc protrusions, degenerative disc disease, cervical spinal stenosis, C7 radiculopathy, depression, and left ankle pain.  Id.

The ALJ acknowledged Dr. Mortazavi's letter and supporting evidence, but failed to place the diagnosis in context in determining Bernard's RFC to perform limited sedentary work.  R. at 22. To justify her finding that Bernard has significant, but not disabling pain, the ALJ cited Dr. Mortazavi's statement that Bernard's medication regime kept Bernard's pain at tolerable levels and "he is able to go throughout his day."  R. at 22; but see R. at 353.  To further support her

---

[26] Bernard visited Dr. Mortazavi at least ten times between November 29, 2005 and January 15, 2007 for pain treatment.  R. at 238-60.  This establishes the requisite ongoing doctor-patient relationship.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

proposition, the ALJ referenced four isolated reports of back pain improvement.  R. at 22.  The ALJ also noted Dr. Mortazavi did not conclude Bernard was "physically unable to work," nor did Dr. Mortazavi identify specific extertional work limitations.  Id.

The ALJ's analysis mischaracterized Dr. Mortazavi's February 2, 2007 letter by improperly dissecting the language of the letter[27] and disregarded its context.  Although the ALJ noted the letter states Bernard's pain medication regimen keeps his pain at tolerable levels and "he is able to go throughout his day," it also identified Bernard's myriad painful conditions.  It further noted the medication regimen keeps Bernard's pain to a "somewhat tolerable level where [Bernard] is able to go throughout his day."  Id.  It does not state Bernard's pain does not interfere with his work.  Further, it is immaterial that Dr. Mortazavi stated due to chronic pain, Bernard is "unable to work," R. at 353, instead of stating he is "physically unable to work," see R. at 22.  Contrary to the ALJ's reasoning, it is unlikely and illogical that a physician treating a patient, who underwent three major surgeries and suffers numerous severe impairments, would find it necessary to unilaterally address whether the patient was "physically unable to work."  Such semantic distinctions establish the ALJ's failure to recognize the thrust of Dr. Mortazavi's medical concerns.

The ALJ also mischaracterized the February 1, 2006 report where Dr. Mortazavi noted Bernard's pain medications "are taking the edge off" and at times are "working successfully, as long

---

[27] At step one of the five step sequential analysis, the ALJ considers whether the claimant is capable of "substantial gainful activity."  If so, the claimant is not considered disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Dr. Mortazavi used the term "gainful employment" when he concluded Bernard was unable to work, R. at 353, and the ALJ asserted Dr. Mortazavi was making a determination reserved for the Commissioner, R. at 22.  Dr. Mortazavi's use of the term "gainful employment" does not discredit his opinion, which was supported by extensive medical evidence.  The ALJ cannot demand a treating physician to be versed in social security legal terms and their implications.

as the weather is nice outside." R. at 255. The ALJ failed to recognize the same report also stated Bernard ranked his pain at a six out of ten, his symptoms were exacerbated in the cold and damp weather, and he suffered from restless leg syndrome, severe aches, spasm-like sensations, loss of sleep, loss of appetite, and gastrointestinal problems. Id. The February 1, 2006 report also listed four pain treatments, all of which had failed. Id. Furthermore, Dr. Mortazavi's diagnoses had not changed. According to the February 1, 2006 report, Bernard still suffered from low-back pain, radiculopathy, osteoarthritis, and cervicalgia. R. at 256. The ALJ improperly rejected Dr. Mortazavi's opinion because the ALJ did not rely on contradicting evidence.

The ALJ also mischaracterized Dr. Falatyn's treating physician reports.[28] The ALJ cited Dr. Falatyn's March 15, 2006 report stating Bernard's back pain "seems to be diminishing." R. at 22-23; see also R. at 291. Nevertheless, the ALJ failed to acknowledge Dr. Falatyn also noted Bernard's parethesias was worsening; Bernard was experiencing thigh pain, burning sensation in the skin of his upper thigh and great pain in his neck and left arm; and despite medications, Bernard rated his pain a six to eight out of ten. R. at 291.

The ALJ cited Dr. Falatyn's October 25, 2006 report that Bernard "initially had chronic pain after that but overall has done well in respect to his back and leg pain" and "his back pain is improved" after his August 2005 spinal fusion. R. at 22; see also R. at 287. This summary ignores Dr. Falatyn's other findings. See R. at 287. Dr. Falatyn stated Bernard was still experiencing paresthesias on the left thigh, neck pain, arm numbness, and that Bernard had a left arm EMG earlier during the year that showed a C7 chronic radiculopathy without neuropathy. Id.

---

[28] Dr. Falatyn is also a treating physician. Dr. Falatyn performed two of Bernard's surgeries, R at. 181, 217, and has frequently met with Bernard to diagnosis his medical conditions, See 20 C.F.R. § 416.902; see generally, R. at. 143, 145, 147, 150.

16

The ALJ imputed her own opinion regarding Bernard's medical condition in interpreting Dr. Mortazavi's and Dr. Falatyn's findings.  The ALJ's statements were "speculative inference[s] from medical reports" and mischaracterized the evidence.  Although the ALJ may determine who to credit in a hearing if she has specific and legitimate reasons, the ALJ may not mischaracterize or ignore evidence.  Morales, 225 F.3d at 317.  Dr. Mortazavi's letter and supporting medical reports conclude Bernard has significant pain and is unable to continue gainful employment.  The ALJ did not cite any substantial medical evidence to contradict this point and support her conclusion.   Dr. Falatyn's reports further support Dr. Mortazavi's conclusion that Bernard suffers from a number of conditions that cause him great pain.  Therefore, the ALJ's RFC determination was not supported by substantial evidence.

B.     The ALJ Incorrectly Found Bernard's Other Physical Impairments were Non-Severe

The ALJ's conclusion that Bernard's C7 radiculopathy, chronic headaches, left ankle pain, and gastrointestinal problems were non-severe is not supported by substantial evidence.[29]  An impairment is severe if it "significantly limits [the individual's] ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.921(b).  Basic work activities are "the abilities and aptitudes necessary to do most jobs."  20 C.F.R §§ 404.1520(c), 416.921(b).  The definition of basic work activities include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching,

---

[29] These impairments were not explicitly mentioned in Bernard's DIB or SSI applications. R. at 52-97, 383-86.  The Commissioner, however, does not dispute that the ALJ had notice of them.  The ALJ has an affirmative duty of inquiry to fully and fairly develop the record, Grottoli v. Chater, 1996 WL 617425, at *3 (E.D. Pa. Oct. 18, 1996) (Van Antwerpen, J.); see also Heckler v. Campbell, 461 U.S. 458, 471 (Brennan, J., concurring), and these impairments are in the treating physicians' letters and reports.  Further, two of the impairments the ALJ found were severe, depression and anxiety, were not explicitly mentioned in Bernard's SSI and DIB applications.  R. at 52-97, 383-86.

carrying or handling." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (2004).  A non-severe

impairment is a "slight abnormality . . . which would have no more than a minimal effect on an

individual's ability to work," irrespective of age, education, or work experience.  Bowen v. Yuckert,

482 U.S. 137, 154 n.12 (1987).  Thus, Bernard's burden is "not an exacting one."  McCrea, 370 F. 3d

at 360.  If the evidence on the record presents more than a "slight abnormality," the impairment is

considered "severe," and the step two requirement is met.  Newell v. Comm'r of Soc. Sec., 347 F.3d

541, 547 (2003).

The inquiry at step two in the disability analysis is a "de minimis screening device to dispose

of groundless claims," McCrea, 370 F.3d at 360, and reasonable doubts must be resolved in favor of

the claimant.  Id.  (citing Newell, 347 F.3d 546-47).  Generally, only unsubstantiated or frivolous

claims are denied at this early stage.  See, e.g. Kirk v. Comm'r of Soc. Sec., 177 Fed. Appx. 205, 207

(3d Cir. 2006) (finding an anxiety impairment non-severe because medical evidence concluded the

claimant had no significant psychiatric problems and had not been diagnosed with anxiety or any

other mental disorder); Ellis v. Barnhart, 2005 WL 428570, at *2 (E.D. Pa. Feb. 22, 2005) (Reed, J.)

(concluding claimant's depression was a non-severe impairment because of claimant's lack of

treatment, continuously unremarkable medical reports, and uneffected basic activities).

In determining whether substantial evidence supports the ALJ's finding a claimant failed to

satisfy the de minimis threshold, I must view the record in its entirety.  McCrea, 370 F.3d at 362.

The ALJ's opinion of the relative weight of each piece of evidence may be relevant at later steps of

the sequential analysis but "[does] not carry the day at step two."  Id.; see also Magwood v. Comm'r

of Soc. Sec., 2008 WL 4145443, at *2 (3d Cir. Sept. 9, 2008).

Bernard produced sufficient evidence of other physical limitations that were more than a

18

"slight abnormality," see Bowen, 482 U.S. at 154 n.12, and had more than a minimal impact on his ability to do basic work activities, see McCrea, 370 F. 3d at 361 (citing 20 C.F.R. § 416.920 (c)).  Dr. Mortazavi stated in his February 2, 2007 letter that Bernard was diagnosed with C7 radiculopathy, chronic headaches, ankle pain, and gastrointestinal problems.  R. at 353.  These impairments are supported by medical evidence.  Bernard's radiculopathy is documented through a February 14, 2006 radiology report,  R. at 291, and Dr. Falatyn noted this medical condition in his October 25, 2006 letter.  R. at 287.   Dr. Mortazavi diagnosed Bernard's gastrointestinal problems in five reports: November 29, 2005, February 1, 2006, March 28, 2006, May 31, 2006, and November 27, 2006.  R. at 240, 248, 252, 255, 259.  Dr. Mortazavi also noted in various reports Bernard's knee, lower back, and ankle pain.  R. at 258, 243, 240.   Bernard's neck pain, numbness, and paresthesias in both arms was reported by Dr. Falatyn on October 25, 2006 and March 15, 2006, R. at 287, 291, and Bernard's severe headaches were diagnosed in six of Dr. Mortazavi's reports.  R. at 243-53.

The frequency with which these conditions appeared in the various medical reports suggests these impairments are more than a "slight abnormality," see Bowen, 482 U.S. at 154 n.12, and are serious medical impairments contributing to Bernard's pain and discomfort.  Bernard confirmed how these conditions affected his basic daily activities.  He testified about his inability to sit for more than twenty minutes, R. 407, his difficulty caring for his infant daughter, R. 405-06, and his inability to clean, see e.g. R. at 410.  The ALJ did not discredit Bernard's testimony.  See R. at 22.

The ALJ claimed she accounted for all the symptoms and limitations Bernard testified to at the hearing.  R. at 23.  The ALJ, however, did not address Bernard's subjective complaints given during his testimony.  Regarding his discomfort sitting, Bernard stated during his testimony "Sitting—I want to get up right now and walk around.  I mean, this is hard for me to sit this long

because it's—have to contort myself in awkward positions for my neck and my back to feel better.
My left thigh is very painful . . ." R. at 414. Bernard also mentioned his neck pain, numbness in his
arm, and his stomach problems during his testimony. R. at 415. Dr. Mortazavi's reports and
Bernard's supporting testimony indicate several physical conditions that are severe impairments. The
ALJ identified only disc disease of the cervical and lumbar spine, spondylolisthesis, depression, and
anxiety as severe impairments, R. at 20, despite Bernard's testimony and the medical evidence
supporting his C7 radiculopathy, chronic headaches, left ankle pain, and gastrointestinal problems.
The ALJ erroneously failed to deem these diagnoses as "severe" impairments.

      C.    <u>Bernard's Additional Claims</u>

Bernard also alleges the ALJ failed to include all of Bernard's limitations when posing the
hypothetical to the vocational expert. <u>See</u> Plaintiff's Brief at 24-25. Because I recommend Bernard's
case be remanded for the ALJ's improper rejection of Bernard's treating physician's opinion and for
failing to find Bernard's various physical limitations "severe," it is unnecessary to examine Bernard's
additional claims. A remand may produce different results on these claims, making discussion of
them moot. <u>See</u> <u>Steininger v. Barnhart</u>, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (Baylson,
J.) (not addressing additional arguments because ALJ may revise his findings after remand). For
example, inclusion of other physical limitations could impact Bernard's RFC and a vocational
expert's opinion of the type of work he may be able to perform.

Bernard also requests a different ALJ to hear this case on remand. This request is meritless.
There is no indication of prejudice or partiality with respect to any party. <u>See</u> <u>Liteky v. United States</u>,
510 U.S. 540, 551 (1994); <u>Schweiker v. McClure</u>, 456 U.S. 188 (1982); <u>see also</u> <u>Chamberlain v.</u>
<u>Barnhart</u>, 2002 WL 32341771 (E.D. Pa. Dec. 10, 2002).

Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this 21st day of October, 2009, it is respectfully recommended that Bernard's request for review be GRANTED and the matter be REMANDED to the Commissioner for further review consistent with this report and recommendation.  The Commissioner may file objections to this Report and Recommendation within 10 days after being served with a copy thereof.  See Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.  See Leyva v. Williams, 504 F.3d 357, 364 (3d Cir. 2007).

BY THE COURT:


 \s\ TIMOTHY R. RICE
TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE